Johnny Ray JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–95–00806–CR.

Court of Appeals of Texas,
Dallas.

Sept. 16, 1997.

Discretionary Review Refused
Feb. 25, 1998.

---

Robert Udashen, Dallas, for Appellant.

Lorraine A. Raggio, Assistant District Attorney, Dallas, for Appellee.

Before MALONEY, JAMES and MOSELEY, JJ.

## OPINION

MOSELEY, Justice.

A jury convicted Johnny Ray Johnson of murder and assessed a forty-five-year sentence. Appellant raised five points of error on appeal contending, among other things, that the trial court erred in overruling his *Batson*[1] objections to the State's peremptory strikes of two prospective jurors. For the reasons set forth below, we overrule all of appellant's points and affirm the trial court's judgment.

## BACKGROUND

While on patrol in the early morning hours of October 8, 1994, a Dallas police officer came upon a van stopped on the street with the headlights on. He stopped to investigate and discovered several bullet holes in the passenger side of the van, as well as seven spent casings outside the van. Thomas Johnson was in the driver's seat with his foot on the brake pedal. Johnson was dead.

## LEGAL SUFFICIENCY

In his first point of error, appellant challenges the legal sufficiency of the evidence to support his conviction. Specifically, appellant argues that the evidence is legally insufficient to prove he knowingly or intentionally caused the victim's death. We address this point first because if the evidence is legally insufficient, appellant is entitled to an acquittal.[2]

### A. Standard of Review

When reviewing the legal sufficiency of the evidence to support a criminal conviction, the critical inquiry is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.[3] This Court does not ask whether it believes the evidence at trial establishes guilt beyond a reasonable doubt.[4] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]

The fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony.[6] The fact finder may reject all or part of any witness's testimony.[7] The fact finder need not believe even uncontroverted evidence.[8] The fact finder may draw reasonable inferences from the evidence.[9] We do not disturb the fact finder's decision unless it is irrational or supported by only a "mere modicum" of evidence.[10] We do not substitute our judgment for that of the fact finder.[11]

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.[12] The State must prove the defendant intended to cause the result of his actions to convict him

---

1. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986).

2. *See Burks v. United States*, 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15 (1978).

3. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim. App. [Panel Op.] 1981).

4. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Griffin*, 614 S.W.2d at 159.

5. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Griffin*, 614 S.W.2d at 159.

6. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

7. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim. App.1986), *cert. denied*, 488 U.S. ·872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988).

8. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim.App. [Panel Op.] 1978).

9. *Benavides v. State*, 763 S.W.2d 587, 588–89 (Tex.App.—Corpus Christi 1988, pet. ref'd).

10. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim.App.1988).

11. *Lockett v. State*, 874 S.W.2d 810, 813 (Tex. App.—Dallas 1994, pet. ref'd).

12. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 1994).

of murder.[13] We may infer the intent to kill from the use of a deadly weapon in a deadly manner.[14]

### B. Analysis

■ Viewing the evidence in the light most favorable to the verdict, the record shows that Ferdinand Dominguez, a Dallas police officer assigned to the physical evidence section, collected evidence from the crime scene. He testified that most of the bullets entered the van aimed at the deceased. At least one or two of the bullets that hit the deceased also smashed the driver's side window. He opined that the shots could have come from a moving car. He found no weapons at the crime scene.

James Williams testified that on the evening of October 7, he saw the van in an apartment house parking lot. He thought that two people were in the van. Later that evening, he, Derrick Harris, and Roosevelt Hodge were passengers in an El Camino driven by appellant. Williams said that when appellant saw the van, he made a U-turn and drove about eighty miles an hour to catch up to the van. Appellant pulled the El Camino along side of the van's passenger side and shot at it five, six, or seven times. After appellant shot at the van, it stopped in the middle of the road. Williams thought two people were in the van, but he never saw the deceased point a gun at the El Camino.

Harris testified that earlier that evening they were in an apartment house parking lot. Although he heard appellant and the van's driver exchanging words, Harris did not know what was said. Later, when he, Williams, Hodge, and appellant were all in the El Camino, appellant chased the van. Appellant took a gun from his waistband. Harris did not see anyone in the van with a gun. When appellant caught up with the van, he started shooting and he continued shooting as he drove past the van. Appellant shot through the passenger side of the van about five times. Harris thought two people were in the van and both were killed.

Viewing the above evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that appellant used a gun in a deadly manner. And any rational trier of fact could have inferred from appellant's using a gun in a deadly manner that appellant intentionally or knowingly caused the deceased's death.[15] We overrule appellant's first point of error.

## FACTUAL SUFFICIENCY

Having found the evidence legally sufficient to support appellant's conviction, we now consider appellant's second point of error in which he argues the evidence is factually insufficient to support his conviction.

### A. Standard of Review

When reviewing challenges to the factual sufficiency of the evidence, as opposed to the legal sufficiency, we view all of the evidence without the prism of "in the light most favorable to the prosecution." [16] In conducting a factual sufficiency review, we must be appropriately deferential to the fact finder's determination and avoid substituting our judgment for the fact finder's.[17] We review the fact finder's weighing of the evidence and are authorized to disagree with the fact finder's determination.[18] However, it is not enough that we believe a different result is more reasonable.[19] We will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust.[20]

---

13. *Cook v. State*, 884 S.W.2d 485, 490 (Tex.Crim. App.1994).

14. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex.Crim.App.1984) (op. on reh'g); *Murray v. State*, 861 S.W.2d 47, 53 (Tex.App.—Texarkana 1993, pet. ref'd).

15. *See Adanandus*, 866 S.W.2d at 215.

16. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim.App.1996); *Scott v. State*, 934 S.W.2d 396, 398 (Tex.App.—Dallas 1996, no pet.).

17. *Clewis*, 922 S.W.2d at 133; *Scott*, 934 S.W.2d at 399.

18. *Clewis*, 922 S.W.2d at 133.

19. *See id.* at 135.

20. *Id.* at 129; *Scott*, 934 S.W.2d at 398.

## B. Analysis

▮ In addition to the above evidence, appellant testified in his own defense. He stated that on October 7, 1994, he was visiting friends in Dallas. Appellant said he was standing outside the Highland Hills Apartments when he saw a van drive by. The driver said something to appellant as he passed but appellant could not understand what he said. When appellant saw the van a second time, he saw a handgun pointed at him from the van window. Appellant called the police, but they did not come.

According to appellant, the van came back a third time and tried to run him down. Appellant got into his friend's car and followed the van. Three friends were in the car with appellant. Appellant testified that he followed the van to obtain the license number to report to the police. Appellant knew his friend kept a nine-millimeter pistol between the front seats. As he approached the van, it slowed down and sped up again. Appellant stated that, because he saw a gun sticking out of the van window, he grabbed the nine-millimeter gun and shot at the van in an effort to protect himself. He claimed he was aiming at the vehicle to stop it; he was not trying to hit anyone inside the van.

To support his argument that the evidence is not factually sufficient to show he intentionally and knowingly caused the victim's death, appellant relies on his testimony that he was shooting at the van to stop it and was not shooting at anyone in the van.

After reviewing all of the evidence, including appellant's testimony, without the prism of "in the light most favorable to the prosecution," we cannot conclude that the evidence produced by the State to discharge its burden of proof on each element is so uncertain,

inconsistent, improbable, or unbelievable that it would be clearly unjust to allow the finding of guilt to stand.[21] Although appellant presented conflicting evidence, the jury was entitled to reject his testimony. We cannot conclude that the jury's verdict is so clearly against the overwhelming weight of the contrary evidence that it is clearly wrong or unjust.[22]

## BATSON

In his third and fourth points of error, appellant contends the trial court erred by overruling his objections to the State's peremptory strikes of two prospective jurors.

### A. Applicable Law

In *Batson v. Kentucky*, the United States Supreme Court held that a criminal defendant is entitled to a trial by a jury whose members were selected on a racially neutral, nondiscriminatory basis.[23] This principle was later codified in Texas.[24] *Batson* and its progeny, as well as the code of criminal procedure, set forth a three-step procedure to determine whether the State exercised its peremptory strikes in an unconstitutional manner.

In the first step, the defendant must establish a prima facie case of purposeful discrimination.[25] The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.[26] However, if the defendant makes the requisite prima facie case, the State must come forward with racially neutral explanations for the contested strikes.[27] A racially neutral explanation means only an explanation that, on its face, does not deny equal

21. *See Scott*, 934 S.W.2d at 398.

22. *See Clewis*, 922 S.W.2d at 129.

23. *Batson*, 476 U.S. at 85–86, 106 S.Ct. at 1716–17; *see also Powers v. Ohio*, 499 U.S. 400, 404, 111 S.Ct. 1364, 1367, 113 L.Ed.2d 411 (1991).

24. Tex.Code Crim. Proc. Ann. art. 35.261 (Vernon 1989).

25. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)

(plurality opinion); *Batson*, 476 U.S. at 93–94, 106 S.Ct. at 1721–22.

26. *Purkett v. Elem*, 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam).

27. *Id.* at at 766–67, 115 S.Ct. at 1770; *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Williams v. State*, 804 S.W.2d 95, 101 (Tex.Crim.App.), *cert. denied*, 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991).

protection.[28] As the Supreme Court held in *Purkett v. Elem:* "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." [29]

 If the State presents a facially race-neutral explanation for its peremptory strike, it rebuts the presumption of discrimination arising from the defendant's prima facie case. Thereafter, in the third step in the *Batson* process, the defendant must prove by a preponderance of the evidence that the reasons given by the State in support of its contested strike are a sham or a pretext for discrimination;[30] simply stating his disagreement with some of the State's explanations is insufficient.[31] To meet this burden, the defendant may call witnesses, introduce documents, seek and obtain stipulations, and obtain judicial notice of facts, just as in any other evidentiary hearing. The defendant is entitled to rely on the entirety of the voir dire proceedings in the record without offering them into evidence.[32] However, the defendant must introduce into evidence any prospective juror questionnaires or information cards in order to rely on the information contained in them.[33]

## B. Standard of Review

 Whether the defendant ultimately proved his allegations of purposeful discrimination by a preponderance of the evidence is a finding of fact, which we analyze under a clear error standard of review.[34] The trial court's finding will largely turn on an evaluation of the prosecutor's credibility.[35] Thus, appellate courts will accord the trial court's finding great deference, and will not disturb the finding unless it is clearly erroneous.[36] On appeal, we review the record in the light most favorable to the trial court's ruling.[37] We will reverse only if we are left with the "definite and firm conviction that a mistake has been committed." [38] Furthermore, we will not reverse a trial court's finding based upon information not introduced into evidence during the *Batson* hearing or elicited before the trial judge during the voir dire.[39]

 In determining whether the trial court's ruling was clearly erroneous, we consider whether: (1) the reason given for the peremptory challenge relates to the facts of the case; (2) there was a lack of meaningful questioning of the juror or a lack of meaningful questions; (3) the record shows disparate treatment, where persons with the same or similar characteristics as the challenged juror were not struck; (4) there is evidence of disparate examination of venire members, such as questioning a challenged juror to evoke a certain response without asking the same question of other panel members; and (5) the explanation given for the peremptory challenge is based on group bias where the group trait is not shown to apply specifically to the challenged juror.[40] While we consider

**28.** *Purkett*, 514 U.S. at 767–69, 115 S.Ct. at 1771.

**29.** *Id.* (quoting *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866–67).

**30.** *Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Crim.App.1988).

**31.** *Davis v. State*, 822 S.W.2d 207, 210 (Tex. App.—Dallas 1991, pet. ref'd); *Straughter v. State*, 801 S.W.2d 607, 613 (Tex.App.—Houston [1st Dist.] 1990, no pet.).

**32.** *See Vargas v. State*, 838 S.W.2d 552, 557 (Tex. Crim.App.1992); *Young v. State*, 826 S.W.2d 141, 146 (Tex.Crim.App.1991).

**33.** *Vargas*, 838 S.W.2d at 557.

**34.** *See Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866; *Vargas*, 838 S.W.2d at 553–54.

**35.** *See Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.

**36.** *See Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim.App.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994); *Adanandus*, 866 S.W.2d at 224.

**37.** *Adanandus*, 866 S.W.2d at 224; *Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

**38.** *Hill v. State*, 827 S.W.2d 860, 865 (Tex.Crim. App.) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied*, 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992).

**39.** *Vargas*, 838 S.W.2d at 557.

**40.** *Whitsey v. State*, 796 S.W.2d 707, 713–14 (Tex.Crim.App.1989).

these factors, they are not determinative; the overriding standard is still whether the trial court's decision was supported by the record so that it was not clearly erroneous.[41]

## C. Prospective Juror Number Eight (Evans)

In his third point of error, appellant complains that the trial court improperly overruled his objection to the State's peremptory strike of Mr. Evans, a prospective juror. Appellant complains that the prosecutor's explanation for her strike of Evans was "clearly pretextual" because the State did not strike Detective Smith, another prospective juror, who also made a similar statement. (The parties do not cite us to any place in the record showing Smith is a nonminority juror. However, at trial and on appeal, appellant argued disparate treatment as if Smith were a nonminority and the State never challenged appellant's designation of Smith's race.) Appellant argues this fact shows the prosecutor treated Evans in a manner disparate from Smith based on Evans's race. We disagree.

### 1. Facts

During the *Batson* hearing, the prosecutor stated the following reason for striking Evans:

> Mr. Evans was struck. The State believes that a big part of the defense is going to be self-defense. So in asking the jurors about what might cause—if there was—could upbringing or background or something like that cause some to act differently?
>
> No. 5, No. 6 and No. 8 all said that, yes, that they would react to threats differently, that they won't necessarily—that everyone does not react the same way. Basically, that they would hold people from a certain socioeconomic background to a different standard. And we struck all jurors that said that.

In response, appellant argued that another prospective juror, Smith, had also stated that people are products of their environments and the State did not strike him. However, appellant did not call any witnesses or ques-

tion the prosecutor about her strike of Evans or Smith. When the trial court asked the prosecutor why she did not strike Smith, she responded:

> But, Your Honor, there's a difference between saying that people are products of their environment and the comments by the three jurors on the first row, which is, because of their environment, people react differently to threats which we anticipate will be the defense in this case. And that goes to holding the defendant to a possible lower standard than other people.

The prosecutor also stated that she did not strike Smith because she did not believe he would be reached (he was prospective juror number thirty-eight). The record shows the prosecutor's expectation was correct, as the last juror selected was prospective juror number thirty-three.

At the conclusion of the *Batson* hearing, the trial court stated it was "denying [the defendant's] request for disallowing the strikes." Thus, the trial court found that the defendant did not prove by a preponderance of the evidence that the State's proffered reasons for the contested strikes constituted a sham or pretext.

### 2. Analysis

After appellant made his *Batson* motion, the trial court asked the prosecutor to explain why she struck Evans. By requiring this explanation, the trial court implicitly found that appellant made a *prima facie* showing of purposeful discrimination.[42] Thus, we must determine whether the prosecutor gave specific, race-neutral reasons for challenging Evans.

Here, the prosecutor stated that she struck Evans because, from his responses to appellant's voir dire questions, she believed that Evans would hold appellant to a lower standard of behavior based on his socioeconomic background. This is a facially race-neutral reason because it is based on something other than Evans's race.[43] Because the prosecutor's stated reason for striking Evans

---

**41.** *Vargas*, 838 S.W.2d at 554.

**42.** *See Hill*, 827 S.W.2d at 865.

**43.** *See Jones v. State*, 845 S.W.2d 419, 421 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd).

was specific and race-neutral on its face, the prosecutor rebutted appellant's prima facie case of discrimination. Therefore, to prevail, appellant had to prove purposeful discrimination by a preponderance of the evidence. We must now decide whether the trial court was clearly erroneous in holding that appellant failed to meet this burden.

 Appellant argued that the prosecutor's explanation for striking Evans was "clearly pretextual" because the prosecutor did not strike Smith, who allegedly made a similar comment. In other words, appellant contends the prosecutor treated Evans in a disparate manner from a nonminority juror (Smith) because of his race.

 Disparate treatment of prospective jurors based on race is a factor to consider in determining whether a State's facially race-neutral explanation is a pretext for discrimination.[44] Circumstances that may indicate disparate treatment include, among others: (1) the State not questioning any of the minority prospective jurors yet striking them anyway and (2) the State striking minority prospective jurors who gave answers similar to nonminority prospective jurors the State did not strike.[45]

 The decision to strike a particular potential juror is not susceptible to rigid qualification.[46] Disparate treatment cannot automatically be imputed in every situation where one of the State's reasons for striking a prospective juror would technically apply to another prospective juror whom the State found acceptable.[47] Potential jurors may possess the same objectionable characteristics, but in varying degrees.[48] Additionally, prospective jurors may share a negative feature, but that feature may be outweighed by characteristics that are favorable from the State's perspective.[49] Such distinctions may properly cause the State to challenge one potential juror and not another. This is why we accord deference to the trial judge, who was present to view the voir dire proceedings, hear the examination of the prospective jurors, and assess the credibility of the State and its explanation.[50]

We assume without deciding that Evans and Smith made statements sufficiently similar as would, standing alone, raise an inference of disparate treatment. Smith nevertheless had a significant additional attribute, positive from the prosecution's perspective, that Evans did not have: Smith was a police officer. The record clearly shows that everyone, including the trial judge, was aware that Smith was a police officer. The trial judge himself elicited this fact from Smith early in the voir dire proceeding. Because this evidence was presented to the trial court, we may consider it on appeal.[51] The fact that Smith was a police officer is a positive characteristic favorable to the prosecution. As a matter of common sense, prosecutors generally want police officers on criminal juries and defense attorneys generally do not. Further, although not specifically argued, it was reasonable for the State to anticipate that appellant would strike Smith because he was a police officer. In fact, appellant's jury strike sheet, contained within the transcript, shows appellant struck Smith with his first peremptory strike.

 The State did not specifically point out to the trial court that Smith was a police officer. Thus, the dissent argues that the State offered no positive attribute of Smith that would override the shared attribute, negative from the State's perspective, of believing people are products of their environments. The dissent argues the trial court

---

**44.** *See Keeton,* 749 S.W.2d at 866.

**45.** *See Young v. State,* 848 S.W.2d 203, 205 (Tex. App.—Dallas 1992), *pet. ref'd,* 856 S.W.2d 175 (Tex.Crim.App.1993).

**46.** *See Cantu,* 842 S.W.2d at 689.

**47.** *Id.*

**48.** *See id.*

**49.** *See Hermosillo v. State,* 903 S.W.2d 60, 67 (Tex.App.—Fort Worth 1995, pet. ref'd) (although nonstricken nonminority jurors also had minor arrest records, fact that they had recently been crime victims was positive characteristic favoring prosecution).

**50.** *See Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *Cantu,* 842 S.W.2d at 689.

**51.** *See Vargas,* 838 S.W.2d at 556.

could not consider this fact in evaluating the prosecutor's explanation for striking Evans, and this Court cannot consider this fact in determining whether the trial court's decision is so unsupported by the record as to be clearly erroneous. The dissent's position would shift the burden to the State to prove non-discriminatory intent in contravention of *Purkett*. In *Purkett*, the Supreme Court held that the ultimate burden of persuasion regarding racial motivation remains with the opponent of the strike.[52] Once the prosecutor gives a race-neutral explanation in support of the contested strike during the second step of the *Batson* inquiry, the State has no further burden; the defendant must prove his allegations of purposeful discrimination.[53] Both appellant and the State may rely on what is in evidence from the voir dire and the *Batson* hearing.[54] Thus, even if the State did not specifically argue this fact to the trial court during the third step of the *Batson* process, the trial court could consider it when assessing whether the State's strike of Evans, but not Smith, constituted disparate treatment. Neither the trial court nor this Court is required to blind itself to the fact that Smith was a police officer.

 The dissent also argues that the State's strike of Evans without questioning him is another indication of disparate treatment. However, the absence of questioning does not invariably reveal discriminatory intent. In this case, the nature of the State's voir dire does not lend itself to an inference that the prosecutor's failure to ask Evans any questions was indicative of discriminatory intent. After conducting most of the voir dire himself, the trial judge gave the State thirty minutes to conduct its voir dire. The prosecutor spent most of her time generally discussing the applicable law. Toward the end of her portion of voir dire, the prosecutor directed questions relating to prior jury service to individual jurors who apparently indicated they had served on a jury previously. The prosecutor did not individually question Evans during her portion of the voir dire.

Evans's statement that people from different environments or backgrounds might react differently to threats was made in response to a question posed by appellant's attorney during a discussion of self-defense issues. As the prosecutor had already completed her portion of the voir dire, she did not have an opportunity to question Evans about his statement. The fact that the State did not question a prospective juror before striking him is not determinative of discriminatory intent; rather, it is only a factor to consider in deciding whether the trial court's finding is clearly erroneous. On these facts, the prosecutor's failure to question Evans before striking him is not invariably indicative of discriminatory intent.

As additional support for the trial court's ruling, the record shows the prosecutor stated she struck prospective jurors number five and six (Teele and Clark) for the same reason she struck Evans: they all stated people from different socioeconomic backgrounds reacted to threats differently, and therefore the prosecutor was concerned they might hold appellant to a lower standard of behavior. (Again, the parties do not cite us to any place in the record showing Teele and Clark are nonminority jurors. However, at trial and on appeal, appellant argued as if Teele and Clark were not racial minorities and the State never challenged appellant's designation of their race.) The record also shows that the State did not strike prospective juror number seventeen, an African–American.

 Lastly, the prosecutor stated on the record that she did not strike Smith because she did not believe he would be reached. This is an additional attribute, positive from the State's perspective, distinguishing Smith from Evans. Although Smith was in the strike zone, the record bears out the prosecutor's belief—Smith was prospective juror number thirty-eight and the last person seated on the jury was juror number thirty-three. These facts tend to undermine appellant's contention of disparate treatment based on race and tend to support the trial court's finding that appellant failed to prove

---

52. *Purkett*, 514 U.S. at 767–69, 115 S.Ct. at 1771.

53. *See Williams*, 804 S.W.2d at 101.

54. *See Vargas*, 838 S.W.2d at 557; *Young*, 826 S.W.2d at 146.

purposeful discrimination by a preponderance of the evidence.

The trial court, having listened to the State's explanations and the entire voir dire proceeding, found appellant had failed to prove that the State acted with discriminatory intent in exercising a peremptory strike against Evans. Viewing the record in the light most favorable to the trial court's findings, we are not left with a firm and definite conviction that the trial court made a mistake in denying appellant's *Batson* motion with respect to Evans.[55] We conclude that the trial court was not clearly erroneous in finding that appellant failed to prove the State's peremptory strike against Evans was racially discriminatory. We overrule appellant's third point of error.

## D. Prospective Juror Number Thirty-Four (Ms. Adams)

In his fourth point of error, appellant complains the trial court improperly overruled his objection to the State's peremptory strike of prospective juror number thirty-four (Ms. Adams). Although neither party raised this point, our review of the record shows that prospective juror number thirty-three was the last person seated on the jury. Thus, because she was not reached, appellant can demonstrate no harm from the State's strike of Adams.[56] We overrule appellant's fourth point of error.

## CLOSING ARGUMENT

In his fifth point of error, appellant complains the trial court erred by overruling his objection to the prosecutor's jury argument. Specifically, appellant alleges the prosecutor misstated the law regarding the duty to retreat during his closing argument at the guilt/innocence phase of appellant's trial.

A prosecutor may properly argue: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) pleas for law enforcement.[57] However, an argument that contains a statement of law contrary to the court's charge is error.[58]

Here, appellant's theory of the case was self-defense. The trial court charged the jury on the law of self-defense. Included in the charge was the following statement:

> A person is justified in using deadly force against another if he would have been justified in using force as described in the previous paragraph and a reasonable person in the actor's situation would not have retreated and when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force.

During his closing argument, the prosecutor argued:

> [PROSECUTOR]: I'm going to ask you to find him guilty of murder. When you look at self-defense with deadly force, if you get to that point even at all, remember, there's a duty to retreat. A duty to retreat, which means what? He shouldn't have even gone after that van.

> [DEFENSE COUNSEL]: · I will object to that, Judge. The duty to retreat comes in at the time that there is immediate and necessary use of force.

> [THE COURT]: Rephrase your statement.

> [PROSECUTOR]: A reasonable person would not [*sic*] have retreated. A rea-

55. *See Hill*, 827 S.W.2d at 865.

56. *See Harrell v. State*, 882 S.W.2d 65, 67 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd).

57. *Whiting v. State*, 797 S.W.2d 45, 48 (Tex.Crim. App.1990); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App.1973).

58. *Whiting*, 797 S.W.2d at 48; *see also Branson v. State*, 825 S.W.2d 162, 167 (Tex.App.—Dallas 1992, no pet.).

sonable person wouldn't have gone after that van.

[DEFENSE COUNSEL]: Judge, I will object to the way that is phrased. That's not where that part of the law kicks in.

[THE COURT]: Overruled.

Appellant interprets the prosecutor's argument as creating a duty on appellant's part to refrain from following the van to obtain the license number because he did not have a duty to retreat until he was confronted with the use of deadly force by the victim. We disagree.

Appellant testified that the driver of the van first pointed a gun at him, then later tried to run him down. Deadly force is defined as "a force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury."[59] The prosecutor reasonably deduced from appellant's testimony that, by attempting to run over appellant, the driver of the van exerted deadly force against appellant and argued that a reasonable person would have retreated rather than chase the van. We conclude that the prosecutor's argument did not contain a statement of law contrary to the court's charge; rather, the prosecutor's argument applied the law as contained in the charge to appellant's version of the facts. Thus, the trial court did not err by overruling appellant's objection. Accordingly, we overrule appellant's fifth point of error.

We affirm the trial court's judgment.

MALONEY, J. concurring and dissenting.

Because I cannot agree with the majority's interpretation of Batson[1] and its progeny, I must dissent to that portion of the majority's opinion. As a consequence, I would sustain appellant's third point of error. In all other respects, I agree with the majority's conclusions.

## BATSON MOTION

In his third point of error, appellant contends the trial court erred in overruling his objection to the State's peremptory strike of prospective juror number eight. Specifically, appellant contends the State's explanation for striking Curtis Evans was not racially neutral because the State did not strike a nonminority prospective juror who also believed "people were a product of their environment."

### 1. Standard of Review

The Equal Protection Clause of the United States Constitution prohibits a prosecutor from challenging a potential juror solely because of his race. *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. The Texas Legislature codified *Batson* in article 35.261 of the Texas Code of Criminal Procedure. *See Hill v. State,* 827 S.W.2d 860, 863 (Tex.Crim.App.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992); *Carrion v. State,* 802 S.W.2d 83, 88 (Tex.App.—Austin 1990, no pet.).

When we review *Batson* issues, we follow the clearly erroneous standard. *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex.Crim.App. 1989) (op. on reh'g). We review the evidence in the light most favorable to the trial court's ruling. *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Crim.App.), *cert. denied,* 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991). If the record supports the trial court's ruling, we do not disturb its ruling on appeal. *Keeton v. State,* 749 S.W.2d 861, 870 (Tex.Crim.App.1988).

### 2. Applicable Law

To invoke *Batson* protections, a criminal defendant must first make a prima facie showing that the State's peremptory challenges are racially motivated. *Wheatfall v. State,* 882 S.W.2d 829, 835 (Tex.Crim.App. 1994), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995); *Chambers v. State,* 866 S.W.2d 9, 23 (Tex.Crim.App.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). If the trial court

---

59. *Holmes v. State,* 830 S.W.2d 263, 265 (Tex. App.—Texarkana 1992, no pet.).

1. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

conducts a *Batson* hearing in which the State offers a race-neutral explanation for its challenges, we do not examine the appellant's prima facie showing. *Wheatfall,* 882 S.W.2d at 835.

The burden then shifts to the State to rebut this showing with a race-neutral explanation for its challenge. *Id.* The prosecutor must give clear, legitimate, and reasonably specific reasons for striking a particular juror. *Whitsey,* 796 S.W.2d at 713. If the prosecutor provides a race-neutral explanation, the burden shifts back to the defendant to rebut the prosecutor's explanation or to show the explanation was merely a sham or pretext. *See Williams,* 804 S.W.2d at 101. The defendant has the ultimate burden to persuade the trial court by a preponderance of the evidence that the allegations of purposeful discrimination are true. *Tompkins v. State,* 774 S.W.2d 195, 202 (Tex.Crim.App. 1987), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989); *Williams v. State,* 767 S.W.2d 872, 874 (Tex.App.—Dallas 1989, pet. ref'd) (en banc).

When the defendant rebuts the prosecutor's explanations, we examine those "neutral explanations" to determine if they are pretexts for racially-motivated peremptory challenges. *Reich–Bacot v. State,* 789 S.W.2d 401, 403–04 (Tex.App.—Dallas 1990) (citing *Whitsey,* 796 S.W.2d at 713), *pet. dism'd, improvidently granted,* 815 S.W.2d 582 (Tex. Crim.App.1991). That a prosecutor assumes some fact about a prospective juror without questioning the prospective juror to verify his theory is some indication that a peremptory strike is not race-neutral. *Esteves v. State,* 859 S.W.2d 613, 615 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd).

We also consider disparate treatment in determining whether a State's facially race-neutral explanation is a pretext. *Keeton,* 749 S.W.2d at 866. We do not automatically impute disparate treatment to every situation where one of the State's reasons for striking a prospective juror also applies to another

prospective juror whom the State did not strike. *Cantu v. State,* 842 S.W.2d 667, 689 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731. Factors that may indicate disparate treatment among prospective jurors include (1) the State's striking, but not questioning, any of the minority prospective jurors, (2) the State's striking minority prospective jurors, but not striking nonminority prospective jurors who gave similar answers, and (3) the State's striking minority prospective jurors, but not striking nonminority prospective jurors who had the same professional, social, or religious characteristics. *Young v. State,* 848 S.W.2d 203, 205 (Tex.App.—Dallas 1992), *pet. ref'd,* 856 S.W.2d 175 (Tex.Crim.App.1993). That the State did not strike persons with the same or similar characteristics as the challenged juror weighs heavily against a racially neutral explanation given by the State. *Miller–El v. State,* 790 S.W.2d 351, 357 (Tex.App.—Dallas 1990, pet. ref'd). However, the State's offering multiple reasons for striking a particular prospective juror indicates a lack of disparate treatment. *Cantu,* 842 S.W.2d at 689.

### 3. Application of Law to Facts

At trial, appellant objected to the State's striking of prospective juror number eight, Curtis Evans.[2] Appellant contends the State's peremptory strike of Evans amounted to disparate treatment between Evans and prospective juror number thirty-eight, Detective Loy Smith, a nonminority prospective juror that the State did not strike.[3]

The State explained that it struck Evans as follows:

The State believes that a big part of the defense is going to be self-defense. So in asking the jurors about what might cause—if there was—could upbringing or background or something like that cause someone to act differently?

No. 5, No. 6 and No. 8 all said that, yes, that they would react to threats differently, that they won't necessarily—that every-

---

**2.** The record shows that Curtis Evans and appellant were both African American.

**3.** The parties direct this Court to no place in the record that reveals that Smith is a nonminority.

However, at trial, appellant argued disparate treatment as if Smith were a nonminority and the State never challenged appellant's designation of Smith's race.

one does not react the same way. Basically, that they would hold people from a certain socioeconomic background to a different standard. And we struck all the jurors that said that.

This explanation is facially race-neutral. Appellant challenged the State's reasoning, alleging that the State did not strike Smith who, like Evans, stated that people were a product of their environment. Specifically, appellant stated the following:

[APPELLANT]: Regarding Mr. Evans, No. 8, Detective Smith, No. 38, also stated that people were a product of their environment. The State failed to strike him. They were—as far as his response, I don't understand how that would be anything that is a race neutral reason.

If somebody is in a certain situation or certain background, of course, they are going to act differently. And that's what the Court would ask in the charge, that a reasonable and prudent person would place themselves in place of the defendant from his viewpoint, including his background, his environment, etc.

Because appellant rebutted the State's racially-neutral explanation, we examine the record to determine whether disparate treatment occurred between Evans and Smith.

The State questioned neither Evans nor Smith during voir dire. Only appellant questioned Evans as follows:

[APPELLANT]: Mr. Teele and Mr. Clark were talking about that someone's reaction may depend on their socioeconomic or their life situation, their background or that type thing.

[EVANS]: Yeah. I can relate to that. Depends on the environment they were raised in or being around certain individuals. Not so much the climate, but the community, the neighborhoods, per se.

[APPELLANT]: Let's talk about a neighborhood. Do you think somebody from a certain neighborhood might have a different mind set as to a threat made against him that someone in another neighborhood might not?

[EVANS]: Yeah.

[APPELLANT]: I know that's a terrible question.

[EVANS]: I would say, yeah, because you have a tendency of thinking positive, depending on the neighborhood, than you would thinking negative on the situation where you are.

[APPELLANT]: I mean, if—do you know or how do you feel about somebody maybe being from the neighborhood that—being in a situation where they don't necessarily trust or rely on the police to help them in certain situations?

How do you feel about that?

[EVANS]: Well, that's based on what you call survival. You have to come—look out for yourself or your neighbors. I'm opposed to it.

That's why we got law enforcement officers, to patrol the community and take care of the problems. But sometimes it comes to the point where it's kind of a do or die situation.

Appellant never asked Evans if he would hold appellant to a lower standard because of his upbringing. Nor did the State ask *any* questions to verify its assumption—that Evans would hold appellant to a lower standard—at the *Batson* hearing. But, the State gleans from Evans's responses to appellant's questions its opinion that he would hold appellant to a lower standard than he would hold someone from another environment. That the State did not verify its assumption is one indication that its explanation was not race-neutral. *See Esteves,* 859 S.W.2d at 615.

Moreover, appellant questioned Smith in a similar manner. Smith responded as follows:

[APPELLANT]: I'm going to ask you, Detective Smith, are there parts of Dallas where crime is extreme or violence is a way of life?

[SMITH]: Yes. There are various areas that are more violent than others.

[APPELLANT]: Are there parts of Dallas where those areas are more—violence is more prevalent, to where the police are just flat over-loaded as far as their response?

[SMITH]: That's correct.

[APPELLANT]: Would it surprise you or how would you feel? You've seen it. You've seen it every day. People that are products of their environment. Would you agree with that?

[SMITH]: That's correct.

Smith, like Evans, agreed that, in certain areas, violence is a way of life and people are a product of their environment. However, the State did not glean from Smith's testimony that he would hold appellant to a lower standard than he would hold someone from another environment. Nor did the State strike Smith.

When the trial court asked the State why it did not strike Smith, the State responded: "But, your Honor, there's a difference between saying that people are products of their environment and the comments by the three jurors on the first row, which is, because of their environment, people react differently to threats which we anticipate will be the defense in this case. And that goes to holding the defendant to a possible lower standard than other people." The State gave only one reason for striking Evans—that he would hold the defendant to a lower standard. Although both jurors gave similar answers, the State interpreted those answers and reached totally different conclusions.

At trial, the State offered only its belief that Smith would not be reached as a positive attribute to override his belief that people are products of their environments. The majority agrees that "thinking" Smith would not be reached is a positive attribute. The majority ignores the critical inquiry in *Batson*—that the minority prospective juror was within the strike zone, not that the State did not "think" the nonminority prospective juror would "be reached." *See Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.[4] Even if "reaching" a prospective juror were the test, it cannot be viewed as a positive attribute used to outweigh a negative attribute.

The majority, however, finds another positive attribute on its own. The majority offers Smith's occupation of police officer as a positive attribute. Unlike the majority, I find it difficult to conclude from the evidence that the State viewed Smith's occupation as a positive attribute. It is apparent from the record that the State had two opportunities to offer Smith's occupation as a positive attribute and did not do so. The State could have raised this "positive attribute" in response to appellant's prima facie case or to the trial court's questioning why the State did not strike Smith who gave a similar response as Evans. I do not read *Batson* to place a burden on the reviewing court to come up with reasons the State *could* have given. Only the State knows why it did or did not strike a prospective juror, and it has a burden to offer its reasons to the trial court for review. We cannot assume the State relied on a reason it did not offer.

The majority relies on *Vargas v. State*, 838 S.W.2d 552 (Tex.Crim.App.1992), and *Young v. State*, 826 S.W.2d 141 (Tex.Crim.App. 1991), to support its position that the State may argue anything found in the voir dire proceeding for the first time on appeal. *Vargas* does not stand for this proposition. The State in *Vargas* presented no new argument to the reviewing court.

*Young* cannot support the majority's position. In *Young*, the defendant argued disparate treatment among prospective jurors for the first time on appeal. The court of criminal appeals held that a defendant may, within the confines of the evidence before the trial court, argue disparate treatment for the first time on appeal. *Young*, 826 S.W.2d at 146. In the face of a "new" argument on appeal, the *Young* court agreed that the State may respond to that "new" argument with any evidence found in the voir dire record. *Id.* Because Young argued disparate treatment for the first time on appeal, the State had no opportunity to respond to that argument below. These two facts are critical to the holding in *Young*. These two facts are absent in this case. Here, appellant argued disparate treatment in the trial court. Appellant makes no new argument on appeal.

4. I agree with the majority that any error would be harmless if a minority prospective juror was too far down the jury list to have been reached. *Harrell v. State*, 882 S.W.2d 65, 67 (Tex.App.— Houston [14th Dist.] 1994, pet. ref'd). However, Evans was prospective juror number eight and would have been reached.

The State responded to appellant's disparate treatment argument in the trial court. *Young* does not authorize the State to present a different or additional response on appeal to the same argument defendant presented below and responded to by the State during voir dire.

The record establishes that (1) the State struck Evans without questioning him, (2) the State struck Evans for a reason that applied equally to Smith, but did not strike Smith, and (3) the State did not articulate a positive attribute of Smith that outweighed the negative attribute shared by Evans and Smith. These three factors reveal disparate treatment by the State, and I can only conclude on a racial basis. Viewed in the light most favorable to the trial court's ruling, I cannot say the record supports the trial court's ruling on Evans.

Accordingly, I would sustain appellant's third point of error, reverse the trial court's judgment, and remand this cause for a new trial.